**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**JAMES A. LEFTWICH, JR.,**

**Plaintiff,**

**v.**

**GALLAUDET UNIVERSITY,**

**Defendant.**

**Civil Action No. 11-CV-798 (BJR)**

**MEMORANDUM AND OPINION GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This matter is before the court on Defendant's, Gallaudet University ("Defendant" or "the University"), Motion to Dismiss, or, in the Alternative, for Summary Judgment. (Dkt. No. 9.). Plaintiff, James A. Leftwich, Jr. ("Plaintiff"), filed an Opposition to the Motion on February 13, 2012 (Dkt. No. 11), Defendant filed a Reply on March 21, 2012 (Dkt. No. 13), and Plaintiff filed a Sur-Reply on April 16, 2012.[1]

Plaintiff instituted the present action against Defendant on April 27, 2011, alleging claims under the American with Disabilities Act of 1990, 42 U.S.C. § 12112 ("the ADA"), the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the District of Columbia Human Rights Act, D.C. Code §§ 2.1401 *et seq*. ("DCHRA"), and the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"). (Dkt. No. 7 at ¶ 5.). Specifically, Plaintiff alleges that the University: (1) discriminated against him, subjected him to a hostile work environment and terminated his position at the University based on his race in violation of Section 1981 (Counts 1 and 2); (2) failed to accommodate his disability, subjected him to a hostile work environment on the basis of his race, terminated his position with the University on the basis of his race,

[1] The court granted Plaintiff leave to file a sur-reply on May 15, 2012.

disability and/or in retaliation for engaging in a protected EEO activity, and retaliated against him for participating in a protected EEO activity in violation of the DCHRA (Counts 3 through 8); (3) failed to accommodate his disability, subjected him to a hostile work environment, and unlawfully suspended him on the basis of his disability in violation of the ADA (Counts 9, 11 and 14); and subjected him to a hostile work environment on the basis of race, and retaliated against and suspended him for engaging in a protected EEO activity in violation of Title VII (Counts 10, 12 and 13).

Defendant moves, pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, Federal Rule 56, to dismiss: (1) Counts 9 through 15 brought pursuant to the ADA and Title VII for failure to exhaust administrative remedies, (2) Counts 3 through 8 brought pursuant to the DCHRA as time-barred, and (3) Counts 1 and 2 for failure to state a claim for discriminatory treatment under Section 1981. Having considered the parties' arguments, pleadings, and relevant case law, the court finds and rules as follows.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff is a 36-year-old African-American man who was hired by the University on May 19, 2003 as a campus police officer. (Dkt. No. 7 at ¶¶ 1, 15-16.). On October 26, 2006, in the course of performing his duties, Plaintiff fe1l from a fence and injured his ankle. (*Id*. at ¶ 26.). His injury required surgery and he was out on Worker's Compensation Leave until he returned to work on April 17, 2007. (*Id*. at ¶¶ 28, 32.). Plaintiff alleges that as a result of this injury, he is permanently physically disabled with substantial limits to his ability to walk, run, stand, climb, and kneel. (*Id*. at ¶ 29.). Plaintiff obtained an Independent Medical Evaluation ("IME") through the University's Worker's Compensation Program. (*Id*. at ¶ 33.). The IME stated that he "cannot

return to full duty nor will he ever be able to return to his job in a full duty position. A sedentary job is recommended." *Id*.

Plaintiff asserts that the University granted him a reasonable accommodation for his disability by restructuring his duties to include sedentary, administrative tasks related to campus security. (*Id*. at ¶ 34.). His job duties included, but were not limited to, Front Desk Technician, Dispatcher and Assistant to the Community Relations Coordinator/Investigator. *Id*. When Plaintiff returned to work, he reported to his immediate supervisor, Virginia Fedor, a Caucasian female who is the Community Services and Investigations Coordinator for the University. (*Id*. at ¶¶ 18, 37.). Additionally, Plaintiff reported to Fabienne Collson, the Manager of Communication Services at Gallaudet. (*Id*. at ¶¶ 19, 37.). Ms. Collson is also Caucasian. (*Id*. at ¶ 19.). Plaintiff also reported to Ms. Wendy Potts, Deputy Director of Defendant's Department of Public Safety. (*Id*. at ¶¶ 20, 37.). Ms. Potts is African-American. (*Id*. at ¶ 20.). Ms. Pott's direct supervisor is Ms. Batten-Mickens, the Director of Public Safety. (*Id*. at ¶ 21.). Ms. Batten-Mickens is also African-American. *Id*.

Plaintiff claims that from the moment he was placed in an administrative position, he was ostracized, unwelcome, and singled out for adverse treatment. (*Id*. at ¶ 40.). He alleges that Fedor and Potts repeatedly assigned him tasks that went beyond his physical limitations in contravention of the light duty accommodation. (*Id*. at ¶ 41.). He claims that frequently, when he reminded Fedor of his physical limitations, she would respond that he was being insubordinate and lazy. (*Id*. at ¶ 42.).

For instance, Plaintiff claims that in October 2007, Fedor and Potts assigned him to work at an outdoor surveillance post. (*Id*. at ¶ 43.). Plaintiff alleges that he expressed concern to Potts that his injury prevented him from being able to defend himself or anyone else if trouble arose,

and, as such, his assignment to that post posed a security risk. *Id*. Plaintiff claims that Potts told him that he would be reprimanded and possibly suspended or terminated if he did not work at the designated post. *Id*. Plaintiff alleges that in May 2008, Fedor ordered him to perform a follow up investigation on police reports—a task requiring him to walk through campus dormitories for an extended period of time exceeding his physical capacity. (*Id*. at ¶ 57.). Plaintiff alleges that he expressed concern to Fedor about his ability to perform the task. *Id*. It is unclear from the complaint whether Plaintiff completed the task, but Plaintiff alleges that several days later, he received a letter from Potts in which she stated that she was "concern[ed]" about his refusal to perform assigned tasks that exceed his reasonable accommodation and physical abilities. (*Id*. at ¶ 58.).

Plaintiff asserts that in July 2008, Fedor instructed him to clean out a storage area, a task that would require him to stand and lift heavy objects while climbing a ladder for a period of time greater than one hour. He claims that when he reminded Fedor of his physical limitations, she threatened him with disciplinary action. He maintains that he completed the task, but later sent a letter to Potts describing the incident and inquiring why he was "continually asked to perform tasks outside the scope of his accommodation." (*Id*. at ¶ 63.). He claims that Potts never responded to the letter. (*Id*. at ¶ 64.). Plaintiff also claims that in September 2009, he was assigned to fingerprinting duty, a job that he alleges required him to stand for a period of time exceeding four hours. (*Id*. at ¶ 81.).  According to Plaintiff, when he complained about the physical requirements, Fedor threatened to discipline him if he did not complete the task. (*Id*. at ¶ 82.).

In addition, Plaintiff claims that he was treated in a rude and demeaning manner on a number of occasions. (*Id*. at ¶ 43.). For instance, he alleges that Ms. Collson often stated that he

was not a part of her team that she did not want him working in dispatch. *Id*. He claims that on April 30, 2008, Collson threw a document at him and stated, "Oh, by the way Officer Leftwich, this is for you," in a rude manner while she walked away from him. (*Id*. at ¶ 47.). He further alleges that as Collson left, Bob Wilson, a Caucasian male and the DPS Communications Manager approached Plaintiff and told him to "get [his] ass out there and help Frank Turk." He claims that Wilson also stated, "don't worry about it because you are not going to be working here much longer anyway, boy." (*Id*. at ¶ 48.).

Plaintiff maintains that he wrote a letter to Ms. Batten-Mickens that same day, reporting Collson's and Wilson's conduct and stated that he felt disrespected and discriminated again. (*Id*. at ¶ 49.). Plaintiff alleges that he expressed that Wilson's use of the word "boy" was racially derogatory and inflammatory and requested that Wilson's behavior be corrected. (*Id*. at ¶ at 50.). Plaintiff claims that he sent a copy of the letter to Ms. Fedor. (*Id*. at ¶ 51.). Plaintiff further alleges that on May 5, 2008, Ms. Batten-Mickens e-mailed him acknowledging his letter and stating that she would investigate the incident. He claims that she also forwarded his letter to Sharrell McCaskill, an African-American female who is the Director of Equal Opportunity Programs at the University. (*Id*. at ¶¶ 21 and 52.). Plaintiff claims that "within hours of receiving this e-mail" Fedor issued him a reprimand for his conduct during the April 30, 2008 incident, claiming that his "demeanor was unprofessional, inappropriate, and negatively impact[ed] the public's image of [the security] Department." (*Id*. at 53.). Plaintiff alleges that, to his knowledge, no disciplinary action was taken against Collson or Wilson. (*Id*. at 56.).

Plaintiff also claims that he was subject to offensive and insensitive remarks about his race (black) and overall appearance (large) on an almost daily basis. (*Id*. at ¶ 74.). For instance, he claims that in July 2009, he and two other black coworkers were talking in the break-room

when Fedor walked in. She assigned him a task and then allegedly stated: "Stay out of trouble" and "don't get locked up." (*Id*. at ¶¶ 74-75.). Plaintiff felt that this comment was a "threat directly related to the well-publicized mistaken, racially motivated arrest of Harvard University Professor Henry Louis Gates, Jr., two days earlier." (*Id*. at ¶ 75.). Plaintiff claims that he wrote a letter to Fedor expressing his "disgust" at her comment, but that she never responded. (*Id*. at ¶¶ 76-77.).

Plaintiff asserts that he felt that he was "constantly being singled out and treated more harshly than his coworkers." (*Id*. at ¶ 86.). He claims that he received undue criticism of his work and was repeatedly reprimanded for refusing to do tasks that exceeded his physical limitations. *Id*. He maintains that his attempts to assert his rights were viewed as argumentative and unprofessional by his supervisors. *Id*. He further states that on October 6, 2008, he wrote a letter to Potts in which he complained about Fedor's alleged failure to respect his accommodation limitation and about her behavior towards him, stating: "ever since I returned to D.P.S. from my injury in October of 2006, I have been treated unfairly by Lt. Virginia Fedor. I have been told by [her] that I am lazy, incompetent, lack integrity, and above all a lousy assistant." (*Id*. at ¶ 67.). He claims that on October 12, 2008, he wrote a second letter to Potts complaining of the increasingly tense relationship and describing an incident in which Fedor allegedly said, "I do not want to upset you because you are such a big black guy and you always look mean all of the time." (*Id*. at ¶¶ 68-69.). He claims that Potts responded to his October 6, 2008 letter in a letter dated October 13, 2008, in which she "ratif[ied] Ms. Fedor's perceptions of [him] as lazy and incompetent but otherwise failed to address his complaint of [] failure to accommodate." (*Id*. at ¶ 70.). He claims that Potts never responded to his October 12, 2008 letter. *Id*.

Plaintiff contends that he complained to University management officials on multiple occasions regarding his supervisors' alleged treatment of him. He also claims that he attempted on multiple occasions to avail himself of the University's internal dispute resolution process by contacting the University's EEO Director McCaskill. (*Id*. at ¶¶ 65-66.). He states that McCaskill tried to coordinate a meeting between Fedor and Plaintiff in order to address his concerns, but Fedor refused to participate. (*Id*. at ¶ 66.).

Plaintiff received a negative performance review from Fedor in 2009, with a score falling within the "needs improvement" category. She gave him a 2 in the section entitled "attitude towards assignments" and commented that he "has been reluctant to accept and refused assignments in investigations as well as failed to follow direction." (*Id*. at ¶¶ 71-72.). He claims that he received much higher scores from his other supervisors in previous years. (*Id*. at ¶ 73.).

Finally, Plaintiff asserts, his relationship with his supervisors became so tense that in October 2009, he felt that he could only communicate with them through sign language because he was frequently accused of speaking in an insubordinate manner. (*Id*. at ¶ 79.). He claims that on the day that Fedor assigned him to the fingerprinting duty, she asked him in an "abrasive[]," "abrupt," and "confrontational manner" about the status of the project. (*Id*. at ¶ 83.). He responded in sign language: "It's going fine." *Id*. Thereafter, on October 1, 2009, Collson issued him a five day suspension for insubordination for being "nonresponsive to a direct inquiry from Ms. Fedor." (*Id*. at ¶ 84.).

On October 8, 2009, Plaintiff filed an Intake Questionnaire with the EEOC. (*Id*. at ¶ 85.). Also in October 2009 (the Amended Complaint does not specify the exact date), Plaintiff went out on FMLA leave. (*Id*. at ¶ 88.). He claims that his physical disability, exacerbated by Defendant's alleged failure to accommodate it and in conjunction with the hostile work

environment, caused him severe stress and anxiety. He claims that he began seeing a therapist for stress, anxiety and depression during this time. (*Id*. at ¶¶ 88-89).

On March 24, 2010, the same day that he exhausted his FMLA leave, Plaintiff provided Defendant with a note from his therapist stating that he was under doctor's care and requesting that his return to work date be extended to April 26, 2010. (*Id*. at ¶ 90.). On April 21, 2010, Plaintiff provided another note to Defendant in which the therapist stated that there had been no improvement in his condition and that he was still under doctor's care. (*Id*. at ¶ 91.). Plaintiff asserts that after he sent this second letter, he received a letter from Defendant dated April 14, 2010 stating that he was expected to return to work by April 26, 2010 or he would be terminated based on his inability to return to duty. (*Id*. at ¶ 92.). Plaintiff did not return to work by the specified date, so in a letter dated May 12, 2010, Defendant terminated Plaintiff's position effective April 27, 2010. (*Id*. at ¶ 94.).

## IV. DISCUSSION

### A. Standard of Review

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may file a motion to dismiss to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."[2] *In re Interbank Fund Corp. Sec. Litig*., 668 F. Supp. 2d 44, 47-48 (D.D.C. 2009) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)); *see also* FED. R. CIV. P. 12(b)(6). Ambiguities must be resolved in favor of Plaintiff, giving him the benefit of every reasonable inference drawn from the well-pleaded facts and allegations in the complaint. *In re Interbank Fund Corp. Sec. Litig*., 668 F. Supp. at 47-48.

---

2 The court will treat this motion as a motion to dismiss brought pursuant to Federal Rule 12(b)(6). Although Defendant attached Plaintiff's EEO filing to the motion, the court's consideration of the document does not convert the motion to a Rule 56 motion for summary judgment. *See Meijer v. Biovail Corp*., 533 F.3d 857 (D.C. Cir. 2008) (noting the documents that are "integral to the claim" may be considered in resolving motions to dismiss under Rule 12(b)(6) without converting the motion to a summary judgment motion).

To survive a Rule 12(b)(6) motion, the complaint must plead sufficient facts that taken as true provide "plausible grounds" that discovery will reveal evidence to support Plaintiff's allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when Plaintiff pleads factual content that allows the court to draw the reasonable inference that Defendant is liable for the alleged misconduct." *Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570)). Moreover, "[a] pleading that offers 'labels and conclusions' or a formulaic recitation of the elements of a cause of action will not do. Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant has acted unlawfully." *Id*. (citation omitted).

Although the court must construe the complaint in a light most favorable to Plaintiff, the court is not required to accept factual inferences that are unsupported by facts or legal conclusions cast in the form of factual allegations. *City of Harper Woods Emps' Ret. Sys. v. Oliver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009). The court's function is not to weigh potential evidence that the parties might present at a later stage, but to assess whether the pleading alone is legally sufficient to state a claim for which relief may be granted. *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1086 (D.C. Cir. 1998). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted).

**B. Analysis**

***1. Plaintiff Exhausted His Administrative Remedies***

A plaintiff challenging an employment practice under Title VII and the ADA must first file a charge with the EEOC "within a specified period (either 180 or 300 days, depending on the State) after the alleged unlawful employment practice occurred." *Hodge v. United Airlines*, 666 F. Supp. 2d 14, 20 (D.D.C. 2009) (quoting *Ledbetter v. Goodyear Tire & Rubber Co., Inc*., 550 U.S. 618, 623-24 (2007)); *see also, Marshall v. Federal Exp. Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (Before bringing suit in federal court, ADA plaintiffs, like those under Title VII, must exhaust their administrative remedies by filing an EEOC charge and giving the agency a chance to act on it.). "[I]f the employee does not submit a timely EEOC charge, the employee may not challenge that practice in court." *Ledbetter,* 550 U.S. 624 (citing 42 U.S.C. § 2000e-5(f)(1)).

Defendant claims that Plaintiff failed to file a charge with the EEOC. Consequently, Defendant asserts, Plaintiff has not exhausted his administrative remedies and, therefore, cannot proceed with his Title VII and ADA claims in this court.[3] Plaintiff counters that he filed an Intake Questionnaire with the EEOC on October 8, 2009 and that this constitutes a valid charge. The court agrees with Plaintiff.

To qualify as a "charge," the EEOC Intake Questionnaire must contain "an allegation and the name of the charged party, ... [and] it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008); *see also*, 29 C.F.R. § 1601.12(b) ("a charge is sufficient when the Commission

[3] In the District of Columbia, an EEOC charge must be filed within 300 days of the date of the alleged discrimination. *See Griffin v. Acacia Life Ins. Co*., 925 A.2d 564, 568-69 n. 13 (D.C. 2007). Defendant asserts that the Plaintiff was terminated on April 27, 2010—the last possible date of discrimination—which was more than 300 days ago. As such, Defendant maintains, Plaintiff's Title VII and ADA claims are time-barred.

receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of"). In other words, "a filing is deemed a charge if the document reasonably can be construed to request agency action and appropriate relief on the employee's behalf." *Holowecki*, at 404. "The filing must be examined from the standpoint of an objective observer to determine whether, by a reasonable construction of its terms, the filer requests the agency to activate its machinery and remedial process ...." *Id*. at 402.

Here, Plaintiff's Intake Questionnaire names the Defendant, alleges that he was discriminated against based on his race and disability,[4] and generally describes the discriminatory acts, including that he was subject to "racial slurs, verbal harassment" by Ms. Fedor as well as "suspended for 5 days for insubordination." (Dkt. No. 8, Ex. 1.). These allegations are reasonably interpreted as requests for the EEOC to "activate its machinery and remedial processes," and are therefore "charges." *See Holowecki*, 552 U.S. at 402–03 ("It is true that under this permissive standard a wide range of documents might be classified as charges. But this result is consistent with the design and purpose of the ADEA .... [which], like Title VII, sets up a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process.") (internal citations and quotations omitted).

Also of import is the fact that Plaintiff checked "Box 1" on the Questionnaire, which states, in relevant part: "I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I describe above." (Dkt. No. 8, Ex. 1 at 4.). Of note, Plaintiff did *not* check "Box 2," which states: "I want to talk with an EEOC employee before deciding whether to file a charge of discrimination. I understand that by checking this box, I have not filed a charge

[4] Plaintiff marked on the questionnaire that he was also subject to discrimination based his gender. (Dkt. No. 8, Ex. 1 at 2.). Because he makes no reference to such discrimination in his pleadings, the court will assume that he is no longer proceeding with this claim.

with the EEOC. I also understand that I could lose my rights if I do not file a charge in time." *Id*. Finally, the Questionnaire contains the following statement: "this questionnaire may serve as a charge if it meets the elements of a charge." (*Id*. at 5.). This language, in conjunction with the information provided by Plaintiff on the Questionnaire, can reasonably be construed as a request for EEOC action. *See Tucker v. Howard University Hospital*, 764 F. Supp. 2d 1, 7 (D.D.C. 2011) (noting that completing the Intake Questionnaire alone can amount to a request for agency action, and therefore, a "charge" under *Holowecki*); *Hodge*, 666 F. Supp. 2d at 22 (same); *Bland v. Fairfax County, VA.*, 799 F. Supp. 2d 609, 618 (E.D. Va. 2011) (same); *Stewart v. SEIU United Healthcare Workers-West*, 2012 WL 1357633, *3 (N.D. Cal. April 17, 2012) (same).

Finally, Defendant misrepresents the holding of *Federal Express Corp. v. Holowecki*, 552 U.S. 389 (2008). According to Defendant, *Holowecki* stands for the proposition that "an EEOC Intake Questionnaire, without more, does not meet the standard for an EEOC charge" and that there is an additional requirement that an affidavit be included with the questionnaire in order to constitute a charge. (Dkt. No. 8 at 5-6.). The Supreme Court's holding in *Holowecki* imposes no such requirement. Instead the court held that:

> In addition to the information required by the regulations, *i.e*., an allegation and the name of the charged party, if a filing is to be deemed a charge it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee.

*Id*. at 402. Accordingly, the "import of *Holowecki* is not that a detailed description of facts underlying a charge must be included in a filing, but rather, that a filing constitutes a charge if it can reasonably be construed as a request for agency action." *Tucker*, 764 F. Supp. 2d at 7. The court concludes that the Intake Questionnaire that Plaintiff filed on October 8, 2009 can be reasonably interpreted as a request for the EEOC to take action on his behalf and is, therefore, a

charge within the meaning of the statute of limitations. Defendant's motion to dismiss Counts 9-15 will be denied.

### *2. The DCHRA Claims*

Next, Defendant argues that Plaintiff's DCHRA claims (Counts 3 through 8) are time-barred by the DCHRA's one-year statute of limitations. Dismissal based on this affirmative defense is appropriate when the facts giving rise to the statute of limitations defense are clear from the face of the complaint. *See Ndondji v. InterPark, Inc.*, 768 F. Supp. 2d 263, 280 (D.D.C. 2011) (citing *Smith–Haynie v. Dist. of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998)). A court may dismiss a claim on statute of limitations grounds if "no reasonable person could disagree on the date" on which the cause of action accrued. *Smith v. Brown & Williamson Tobacco Corp.*, 3 F. Supp. 2d 1473, 1475 (D.D.C. 1998) (citing *Kuwait Airways Corp. v. Am. Sec. Bank, N.A.*, 890 F.2d 456, 463 n. 11 (D.C. Cir. 1989)). "[B]ecause statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996).

D.C. Code § 2-1403.16(a) provides that "[a] private cause of action pursuant to [the DCHRA] shall be filed in a court of competent jurisdiction within one year of the unlawful discriminatory act[.]" However, filing a complaint with the D.C. Office of Human Rights "tolls the running of the statute of limitations while the complaint is pending." *Thompson v. District of Columbia*, 573 F. Supp. 2d 64, 67 (D.D.C. 2008); *see also*, *Adams v. District of Columbia,* 740 F. Supp. 2d 173, 183 (D.D.C. 2010) (same). Plaintiff filed a complaint with the D.C. Office of Human Rights on February 23, 2011.[5] (*See* Dkt. No. 11, Ex. 5.). The office dismissed the

[5] In addressing Defendant's affirmative defense concerning the timeliness of his DCHRA claims, Plaintiff asserted in his Opposition—for the first time—that he filed a charge with the D.C. Office of Human Rights on February 23, 2011. (*See* Dkt. No. 11 at 12.). He attached a copy of the complaint to the Opposition. (*Id*. at Ex. 3, *see also*, Ex. 5 (letter from the D.C. Office of Human Rights confirming that Plaintiff filed a charge with it on February

complaint on May 9, 2011 after Plaintiff initiated the instant complaint. *Id*. Accordingly, the statute of limitations was tolled as of February 23, 2011 and the controlling question is whether Plaintiff alleges that a discriminatory act occurred within one year prior to that date. With this in mind, the court will now turn to the claims.

Plaintiff raises four claims under the DCHRA: (1) failure to accommodate his disability; (2) hostile work environment on the basis of race; (3) unlawful discharge on the basis of race and disability; and (4) retaliation for engaging in a protected EEO activity. (*See* Dkt. No. 11 at 8, n. 6.). The application of the statute of limitations to each claim varies; as such, the court will address each separately.

***a. The DCHRA Accommodation Claim***

A reasonable accommodation claim under the DCHRA is based on discrete acts, not prolonged or repeated conduct. *Barrett v. Convington & Burling LLP*, 979 A.2d 1239, 1248 (D.C. 2009) (adopting the reasoning of *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). *See also Davidson v. American Online, Inc.*, 337 F.3d 1179, 1185 (10th Cir. 2003) (applying *Morgan* to reasonable accommodation claims and holding that "plaintiffs are now expressly precluded from establishing a continuing violation exception for alleged discrete acts of discrimination occurring prior to the limitations period, even if sufficiently related to those

---

23, 2011)). Defendant argues that the court should disregard this evidence because Plaintiff failed to allege facts pertaining to the same in the Amended Complaint. (*See* Dkt. No. 13 at 11.). The court disagrees. In deciding a 12(b)(6) motion, a court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citation omitted); *Cole v. Boeing Co*., ___ F. Supp. 2d ___, 2012 WL 661967, *5 (D.D.C. 2012) (same). A court may consider extrinsic documents not expressly reference in the complaint without converting the motion to a summary judgment motion if the document is a matter of public record which the court may take judicial notice. *See, e.g., Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Defendant does not dispute the content nor the authenticity of the complaint filed with the D.C. Office of Human Rights, and there is no unfairness to either party in considering the document. Accordingly, the court will take judicial notice of it. *See, e.g., Williams v. Chu*, 641 F. Supp. 2d 31, 34 (D.D.C. 2009) (taking judicial notice of an EEOC decision); *Muhammad v. New York City Transit Auth*., 450 F. Supp. 2d. 198, 204-205 (S.D.N.Y. 2006) (holding that plaintiff's EEOC charge and the agency's determination are both public records, of which the court may take judicial notice), *see also, Xechem, Inc. v. Bristol-Myers Squibb Co*., 372 F.3d 899, 901 (7th Cir. 2004) (noting that failure to "plead around" a likely affirmative defense is typically not a proper basis for dismissal).

acts occurring within the limitations period"); *Isse v. American University*, 540 F. Supp. 2d 9, 28 (D.D.C. 2008) (same). Consequently, the statute of limitations bars any claim for relief based on denials of accommodation or revocation of accommodation that occurred more than one year prior to the filing of the complaint. *Barrett*, 979 A.2d at 1249.

Plaintiff alleges the following in support of his failure to accommodate claim: (1) in October 2007, Ms. Potts threatened to reprimand, suspend, and/or terminate Plaintiff if he did not follow her instructions with regard to an assignment the violated his medical limitations; (2) in 2008, Mr. Wilson threatened Plaintiff by noting that Plaintiff would not be employed at the University much longer; (3) Ms. Fedor placed several reprimands in Plaintiff's personnel file related to his physical disability; (4) in 2009, Ms. Fedor gave Plaintiff a failing score on his performance evaluation; (5) in September 2009, Ms. Fedor threatened to discipline Plaintiff if he did not complete a fingerprinting assignment that exceeded the scope of his reasonable accommodation; and (6) on April 14, 2010, Defendant sent Plaintiff a letter threatening to terminate him unless he returned to work by April 26, 2010. (Dkt. No. 9.). Of these allegations, only the April 14, 2010 letter falls within the applicable one-year limitation. The remaining five allegations pre-date February 23, 2010 and cannot support Plaintiff's failure to accommodate claim.

Threatening to terminate and/or terminating someone based on his or her disability can be the basis for such a claim under the DCHRA. *See, e.g. Green v. American Univ.*, 647 F. Supp. 2d 21, 38-39 (D.D.C. 2009). Nevertheless, the court finds that this claim also fails. Plaintiff asserts that his "physical disability, exacerbated by Defendant's failure to accommodate him and in conjunction with the hostile work environment, caused him severe stress and anxiety." (Dkt. No. 7 at ¶ 87.). He asserts that "[a]s a result, [he] went out on FMLA leave from October 2009 until

March 2010 [and] during that time [he] began seeing a therapist for stress, anxiety and depression." (*Id*. at ¶¶ 88-89.). In other words, Plaintiff alleges that he took FMLA leave due to "stress, anxiety and depression" *not* due to his physical disability. (*See Id*. at ¶ 90 alleging that that he provided "Defendant with a note from his *therapist* stating that he was still under doctor's care….") (emphasis added). Moreover, the University did accommodate his leave request—twice. It granted Plaintiff FMLA leave from October 2009 to March 24, 2010, and then, per his request, extended the leave to April 26, 2010. (Dkt. No. 7 at ¶¶ 88, 90 and 92.). Thus, even accepting Plaintiff's allegations as true, as this court must do in deciding this motion, Plaintiff has failed to state a viable accommodation claim under the DCHRA. Count 3 will be dismissed.

***b*. *The DCHRA Hostile Work Environment Claim***

Next, Defendant argues that Plaintiff's hostile work environment is time-barred. To make out a claim under the DCHRA for creating a hostile work environment, a plaintiff must prove "(1) that he is a member of a protected class, (2) that he has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment." *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 888 (D.C. 2003) (en banc) (citation omitted); *Cole v. Boeing Co.*, ___ F. Supp. 2d. ___, 2012 WL 661967, *8 (D.D.C. 2012) (same). The Supreme Court has held "that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible ... so long as an act contributing to that hostile environment takes place within the statutory time period." *Morgan*, 536 U.S. at 105 (2002); *see also Lively*, 830 A.2d at 890 (adopting this approach). In order to render earlier incidents timely, the conduct that falls within the limitations period must contribute to a hostile environment, in other words, an environment

that is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Daka, Inc. v. Breiner*, 711 A.2d 86, 93 (D.C. 1998) (citations and punctuation omitted); *Harris v. Wackenhut Servs., Inc.*, 590 F. Supp. 2d 54, 77 (D.D.C. 2008) (same). "[I]solated incidents of offensive conduct do not amount to actionable [workplace] harassment." *Smith v. Jackson*, 539 F. Supp. 2d 116, 138 (D.D.C. 2008) (citation omitted).

Here, Plaintiff alleges that he was subjected to a hostile work environment on the basis of race, including racial comments, numerous reprimands, and racial slurs. He claims that his supervisors repeatedly ignored his concerns and instead reprimanded him for being argumentative, insubordinate and unprofessional. (Dkt. No. 7 at ¶¶ 42, 44-45, 53, 56, 58, 63-64, 66, 70, 72-73, 78, 82, 84 and 86.). Plaintiff further alleges that instead of assisting him in resolving these issues, Defendant repeatedly threatened his job security. *Id*. at ¶¶ 43, 63, 73, 82, 86 and 92. But, again, the only incident that took place within the requisite timeframe is the April 14, 2010 letter.

Plaintiff argues that the letter constituted yet another unlawful employment practice that was part of the overarching hostile work environment. The court disagrees. The letter was not "hostile" as that term has been construed in the relevant case law. The communication was professional and amiable. According to Plaintiff's own testimony, the letter stated:

> If you cannot return to duty on April 26, 2010 the University can no longer hold your position. This means you will be terminated based on your inability to return to duty…We hope you are recovered and ready to return to full duty and will see you on the 26th.

(Dkt. No. 11 at 13.). This letter contains no abusive or inappropriate language. It simply notifies Plaintiff that he is expected to return to work by April 26th or his position with the University will be terminated. Simply put, no reasonable jury could find that this letter contributed to a

hostile work environment. *See, e.g., Barrett*, 979 A.2d at 1247 (conversation with HR Director that was polite and amenable, but in which employer indicated that it would not accommodate plaintiff with a reduced work schedule, did not contribute to hostile work environment); *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 82 (D.D.C. 2007) (noting that if an employee is discriminatorily denied ten promotions over a period of time, that pattern of conduct may give rise to ten separate claims under Title VII, but it would not create a hostile work environment claim based on pervasive intimidation, insult, and ridicule); *Glenn v. Williams*, 2006 WL 401816, *34 (D.D.C. 2006) (finding that a threat to terminate did not contribute to a hostile work environment because it was nothing more than an "ordinary tribulation[] of the workplace that is not actionable"). Accordingly, Plaintiff's hostile work environment claim under DCHRA is time-barred. Count 4 will be dismissed.

***c. The DCHRA Wrongful Termination Claims***

Defendant argues that Counts 5 through 8 are untimely because the April 14, 2010 letter placed Plaintiff on notice that his position would be terminated if he did not return to work on or before April 26, 2010. Plaintiff filed this action on April 27, 2011, a year after he was terminated, but, Defendant argues, a year and one day after he had unequivocal notice of his termination. (*See* Dkt. No. 9 at 8.). Therefore, Defendant maintains, Plaintiff's DCHRA termination claims are time-barred. *Id*.

Under D.C. and federal case law, a plaintiff is terminated from employment when he receives "final, unequivocal, and definite" notice of [his] termination, even if the effective date occurs later. *Sharma v. District of Columbia*, 791 F. Supp. 2d 207, 214 (D.D.C. 2011) (quoting *Del. State College v. Ricks*, 449 U.S. 250, 259 (1980)); *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (to determine the moment of discharge, "the proper focus is on the time of the

*discriminatory* act, not the point at which the *consequences* become painful") (emphasis in original); *Stephenson v. American Dental Ass'n*, 789 A.2d 1248, 1252 (D.C. 2002) (finding that termination occurred on March 29, 1996 when employee received a written memorandum on March 29, 1996 notifying him that his last day of employment would be May 28, 1996); *LoPiccolo v. American University*, 2012 WL 19389, *5 (D.D.C. 2012) (noting that in employment discrimination cases, wrongful termination claims accrue when plaintiff is notified of his or her termination).

"The test of whether or not an employee has been discharged depends upon the reasonable inference that the employee[] could draw from the language used by the employers." *Barrett*, 979 A.2d at 1251 (quoting *Liberty Mutual Ins. Co. v. NLRB*, 592 F.2d 595, 604 (1st Cir. 1979)). "No formal discharge is required if the words or conduct of the employer would reasonably lead an employee to believe that he had been fired." *Id*. (citing *Elastic Stop Nut Division of Harvard Indust., Inc. v. NLRB*, 921 F.2d 1275, 1282 (1990)); *Cesarano v. Reed Smith, LLP*, 990 A.2d 455, 467 (D.C. 2010) (a notice of termination is not "final, unequivocal, and definite" if the possibility of returning to work remains open).

Defendant argues that Plaintiff received "final, unequivocal, and definite" notice of his termination when it sent the April 14, 2010 letter. It argues that a reasonable employee in Plaintiff's position would know, unequivocally, from the language in the letter that if he did not show up to work on April 26, 2010, he would no longer have a job with the University. Therefore, Defendant maintains, for purposes of determining the moment of discharge, April 26, 2010 was the date of the allegedly discriminatory act. As such the statute of limitations began to run on that day and expired one year later on April 26, 2011—one day before Plaintiff filed his complaint.

Plaintiff responds that he did not have unequivocal notice of his termination. He claims he was hopeful that he would be able to return to work by April 26th, and that the April 14th letter left open the prospect that Plaintiff would return to work. Thus, Plaintiff argues, the April 14th letter "was not final, unequivocal, or definite and failed to reasonably lead Plaintiff to conclude that he [had been fired]." (Dkt. No. 11 at 14.).

The court concludes that the April 14, 2010 letter constituted clear and unequivocal notice to Plaintiff of his termination. A reasonable employee in Plaintiff's position would know, unequivocally, from the plain language in the letter, that when he did not show up to work on April 26, 2010, he no longer had a job. Therefore, April 26, 2010 is the date of the allegedly discriminatory act and that is the date that the statute of limitations began to run. Accordingly, Counts 5 through 8 are time-barred and Defendant's motion will be granted as to those claims.

#### ***d. The DCHRA Retaliation Claim***

Under the DCHRA, it is an unlawful discriminatory practice for an employer to retaliate against a person on account of that person's opposition to any practice made unlawful by the DCHRA. *See Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. App. 1994). The elements of a retaliatory claim are the same under DCHRA as under the federal employment discrimination laws. *Howard*, 652 A.2d at 45. A prima facie case of retaliation requires a plaintiff to show: (1) that he was engaged in a statutorily protected activity or that he opposed practices made unlawful by the DCHRA; (2) that his employer took adverse personal action against him; and (3) that a casual connection existed between the two. *Id.* at 44; *Barnes v. Small*, 840 F.2d 972, 976 (D.C. Cir. 1988) (citing *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984)).

In Count 7 of his complaint, Plaintiff alleges that he "repeatedly engaged in protected activity by opposing Defendant's discriminatory practices, filing complaints of perceived

discrimination and requesting and availing himself of an accommodation for his disability." (Dkt. No. 7 at ¶ 135.). He claims that the University was aware of his participation in such protected activities and, as a result, subjected him to "a retaliatory and hostile work environment." (*Id*. at ¶ 137.). Defendant counters that the one year statute of limitations has run on all of the acts alleged by Plaintiff that happened prior to April 27, 2010. As such, Defendant maintains, Count 7 must be dismissed.

As discussed previously, the relevant time-period is the year prior to February 23, 2010, and again, the only alleged act that occurred during that timeframe was the April 14, 2010 letter. However, a close reading of the Amended Complaint reveals that Plaintiff never alleges that this letter, or his ultimate termination, was the result of his participating in protected activity. Plaintiff asserts that "[b]ecause of [his] participation in the EEO process and opposition to Defendant's discriminatory practices, Defendant subjected [him] to a retaliatory and hostile work environment." (Dkt. No. 7 at ¶ 137.). Such vague allegations cannot survive a Rule 12(b)(6) motion. *See Twombly*, 550 U.S. 544, 555 (2007) (citation omitted) (a complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."). Indeed, Plaintiff failed to respond to Defendant's argument pertaining to Count 7 in his Opposition to Defendant's motion. As such, Claim 7 will be dismissed.

**3. The Section 1981 Claims**

Plaintiff alleges in Counts 1 and 2 of the Amended Complaint that Defendant subjected him to a hostile work environment and terminated him on the basis of his race in violation of Section 1981. (*See* Dkt. No. 7 at ¶¶ 95-106.). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). In the

employment context, Section 1981 prohibits discrimination with respect to "the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship." *Tnaib v. Document Technologies, LLC*, 450 F. Supp. 2d 87, 91 (D.D.C. 2006) (citing *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 224 (2nd Cir. 2004)) (internal citation omitted).

Defendant seeks dismissal of these claims on the ground that the Amended Complaint does not state a claim entitling Plaintiff to relief under Section 1981. With respect to Plaintiff's hostile work environment claim under Section 1981, Defendant contends that Plaintiff alleges "very few facts of racially discriminatory behavior," and those facts that he does allege, do not rise to the level of a "hostile work environment." (Dkt. No. 13 at 9, 11.). As to Plaintiff's Section 1981 discriminatory termination claim, Defendant argues that Plaintiff cannot establish a prima facie case for such a claim because his own allegations "reveal that he was not performing his job in a satisfactory manner," nor has Plaintiff alleged that "his position was filled by a person outside his protected class." (*Id*. at 18.). The court will address each argument in turn.

***a. The Section 1981 Hostile Work Environment Claim***

As discussed, *infra*, a hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris,* 510 U.S. at 17 (citation and quotation marks omitted); *Peters v. District of Columbia*, ___ F. Supp. 2d ___, 2012 WL 1255139 (D.D.C. 2012). The Supreme Court in *Harris* explained that assessing whether a hostile work environment exists has both subjective and objective components. Thus, no violation is present "if the victim does not subjectively perceive the environment to be abusive" and the conduct "is not severe or pervasive enough to create an objectively hostile or abusive work environment." *Harris*, 510 U.S. at 21–22. The Supreme

Court has acknowledged that the boundaries of what constitutes an objectively discriminatorily hostile work environment is not "a mathematically precise test." *Peters*, 2012 WL 1255139 at *18 (quoting *Harris*, 510 U.S. at 22). The "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998) (internal quotations and citations omitted). This objective test requires examination of the totality of the circumstances, including "the frequency of the discriminatory [or retaliatory] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Peters*, 2012 WL 1255139 at *18 (quoting *Harris*, 510 U.S. at 23).

The Supreme Court has made clear that Title VII does not establish a "general civility code for the American workplace." *Peters*, 2012 WL 1255139 at *18 (quoting *Oncale*, 523 U.S. at 80).[6] To "[prevent] Title VII from expanding into a general civility code," the Supreme Court has emphasized as "crucial" the requirement that the behavior be "so objectively offensive as to alter the conditions of the victim's employment." *Peters*, 2012 WL 1255139 at * 18 (quoting *Oncale*, 523 U.S. at 81). Bosses may be harsh, unfair and rude, but conduct so characterized does not necessarily rise to the level of a Title VII violation. *Peters*, 2012 WL 1255139 at *18; *see also, Bryant v. Brownlee*, 265 F. Supp. 2d 52 (D.D.C. 2003).

Taken together, the Supreme Court's guidance about the requisite elements for a hostile work environment claim has been enumerated as follows: the plaintiff must show that (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment was severe to a degree

---

[6] "Claims alleging a hostile work environment under § 1981 are analyzed using the same standards at Title VII claims." *Elmahdi v. Marriott Hotel Services, Inc*., 339 F.3d 645, 652 (8th Cir. 2003) (citing *Greer v. St. Louis Reg'l Med. Cent*., 258 F.3d 843, 847 (8th Cir. 2001).

which affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassment, but nonetheless failed to take steps to prevent it. *Peters*, 2012 WL 1255139 at *19; *Dorns v. Geithner*, 692 F. Supp. 2d 119, 135–36 (D.D.C. 2010).

Here, Plaintiff alleges that on nearly a daily basis, he endured offensive and insensitive remarks about his race and overall appearance: "[t]hroughout his employment with Defendant, Plaintiff was subjected to a hostile work environment on the basis of race as evidenced by pervasive, negative racial comments made about him" and "on almost a daily basis" he was "ostracized, belittled, and criticized by his supervisors." (Dkt. No. 7 at ¶¶ 3 and 97; *see also* ¶ 74 ("on an almost daily basis, [Plaintiff] endured offensive and insensitive remarks about his race (black) and overall appearance (large).). Specifically, Plaintiff describes the following conduct, allegedly occurring over a three year period: (1) from the moment he was placed on administrate duty in April 2007, he felt "ostracized, unwelcome and singled out for adverse treatment" and treated by his supervisors in "a rude and demeaning manner"; (2) in October 2007, his direct supervisor, Ms. Fedor, allegedly told Plaintiff that he was "lazy, incompetent, and that he lacked integrity;" (3) another supervisor allegedly agreed with Ms. Fedor's assessment of Plaintiff; (4) on April 30, 2008, Ms. Fedor allegedly threw a report at him and made a rude remark to him; (5) also on April 30, 2008, another supervisor allegedly referred to Plaintiff as "boy" and told him that he would not be working at the University "much longer"; (6) on May 5, 2008 Ms. Fedor issued Plaintiff a reprimand for his conduct during the April 30th incident, claiming that his "demeanor was unprofessional, inappropriate, and negatively impact[ed] the public's image of [the] Department"; (7) in October 2008, Ms. Fedor allegedly told Plaintiff that she did not want to upset him because he is "such a big black guy and [he] look[s] mean all of the time"; (8) he

was counseled and reprimanded multiple times for his attitude, demeanor, and refusal to carry out his assigned tasks; (9) in 2009 he was given a negative performance review; (10) in July 2009, Ms. Fedor allegedly told Plaintiff to "stay out of trouble" and "don't get locked up"; and (11) on October 1, 2009, he was suspended for five days for insubordination. (Dkt. No. 7 ¶¶ 40, 42, 44, 47-48, 53, 69-71, 73-75, 84, and 86-87.). Plaintiff claims that this "persistent abuse" caused him to "suffer[] a mental health breakdown." (*Id*. at ¶ 87.).

The court concludes that Plaintiff has alleged sufficient facts that are probative of a discriminatory hostile work environment. The parties do not dispute that Plaintiff is a member of a protected class, that he personally felt his work environment was hostile, or that Defendant knew or should have known of the alleged harassment. Also, Plaintiff has pled sufficient facts, which if accepted as true, establish a plausible casual connection between the harassment and his status as a member of a protected class. *See Baloch v. Kempthrone*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (court must look to whether the comments or actions at issue "expressly focused" on the plaintiff's protected class). In addition, Plaintiff alleges that the discriminatory conduct occurred nearly every day for three years. Accepting this allegation as true, the court finds that a reasonable person could plausibly find that conduct of nature alleged, committed with the frequency and duration alleged, was sufficiently pervasive to "produce a constructive alternation in the terms or conditions of [his] employment." *Tucker*, 764 F. Supp. 2d at 10 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998). "Even today, all that is required of the amended complaint at this stage is that it provide enough factual heft to show a plausible entitlement to relief; that is, that it contain "enough facts to [nudge] a claim to relief…across the line from conceivable to plausible [.]" *Winston v. Clough*, 712 F. Supp. 2d 1, 13 (D.D.C. 2010) (citing *Twombly*, 550 U.S. at 570) (noting that plaintiff's claim, construed in the light most

favorable to him despite its sparse nature, sufficiently alleges facts that could be probative of a discriminatory hostile work environment claim); *see also*, *Tucker*, 764 F. Supp. 2d at 9-10 (finding complaint adequately pleaded a hostile work environment claim by asserting that "the discriminatory conduct occurred nearly every day for over four years); *Holmes-Martin v. Leavitt*, 569 F. Supp. 2d 184, 193 (D.D.C. 2008) (denying motion to dismiss claim of hostile work environment because the plaintiff "alleged some conduct in support of her claim," and noting that a plaintiff is required to plead facts which "support," not "establish," the claim). Accordingly, Defendant's motion to dismiss is denied as to Count 1.

### *2. Discriminatory Discharge under Section 1981*

Finally, Defendant argues that Plaintiff has failed to establish a prima facie claim for discriminatory treatment under Section 1981. (*See* Dkt. No. 13 at 18.). To establish a prima facie case of discriminatory discharge, Plaintiff must establish that he belonged to a protected class, that he performed at or near the level legitimately expected by his employer, that he was discharged, and that he was replaced by a person outside the protected class. *See Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1512 (D.C. Cir. 1995). However, Plaintiff correctly observes that he does not have to plead facts in his complaint that establish a prima facie case, he need only plead facts that make the claim plausible. *Twombly*, 550 U.S. 569-570 (discussing *Swiekiewicz v. Sorema N.A.*, 534 U.S. 515 (2002)).

Plaintiff's allegations are sufficiently specific to survive a motion to dismiss. He has alleged that he is a member of a protected class and that he had the requisite knowledge, skills and abilities to perform his job duties. (*See* Dkt. No. 7 at ¶¶ 35-36, 38 and 62.). While Plaintiff does not identify any similarly situated non-minorities who were treated differently, at this early stage in these litigation proceedings, the court declines to dismiss Plaintiff's Section 1981 claims

on this ground. Defendant urges the court to dismiss Plaintiff's claim on the ground that he is unable to establish that he was performing his job at a satisfactory level in light of his various reprimands and disciplinary actions. (See Dkt. No. 13 at 18.). But, this is putting the cart before the horse. Plaintiff argues that such disciplinary actions were the result of a discriminatory and retaliatory bias, an argument that he is entitled to explore further through discovery. Accordingly, Defendant's motion will be denied as to Count 2.

## V. CONCLUSION

Based on the foregoing, it is HEREBY ORDERED that Defendant's Motion to Dismiss is GRANTED in part and DENIED in part. Counts 3 through 8 in the Amended Complaint are dismissed.

Dated this 18th day of July, 2012.

Barbara Jacobs Rothstein
U.S. District Court Judge